## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 24-cr-213 (JMC)** |
| **v.** | : | |
| | : | |
| **CHARLES R. WALTERS,** | : | |
| | : | |
| **Defendant** | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Charles Walters to six months of incarceration and twenty-four months of supervised release. The government also requests that this Court impose 60 hours of community service and $3,170 in restitution.

### I.    Introduction

Defendant Charles Walters, a 38-year-old United States Marine Corps veteran, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9

Walters pled guilty to Entering or Remaining in any Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1), and stipulated to the misdemeanor offense of Destruction of Government Property, in violation of 18 U.S.C. § 1361. He was subsequently found not guilty at trial of the felony offense of Destruction of Government Property, in violation of 18 U.S.C. § 1361. The government's recommendation is supported by the defendant's (1) kicking and stomping of black metal fencing on the West Front of the Capitol; (2) advancing towards the Capitol building despite witnessing and filming rioters assaulting police and being sprayed by chemical irritants; (3) entry into the Capitol through the Senate Parliamentarian's door as part of a stack formation minutes after it had been breached; (4) rummaging through a refrigerator in the Senate Parliamentarian's office; (5) yelling and confronting the police throughout the afternoon and early evening; and (6) leaving the Capitol grounds at dusk only after being forced by police to leave.

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Walters's crime support a sentence of six months of incarceration, 24 months of supervised release, 60 hours of community service, and $3,170 restitution.

## II.    Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF No. 36 (Statement of Offense).

---

million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

*Walters's Role in the January 6, 2021 Attack on the Capitol*

On January 5, 2021, Walters drove from his home in Wisconsin to Washington, D.C. and slept in his car. The next day, Walters filmed events throughout the day. He started filming near the Washington Monument at about 8:30 a.m.

By approximately 1:00 p.m., Walters made his way to the West Front of the U.S. Capitol grounds, where a riot broke out as a mob broke through police barricades on the perimeter. Walters was dressed in a black riot-style helmet and black ballistic-style vest.

*Walters Damages Fence on the West Front*

After entering the restricted perimeter, Walters stood with a crowd of rioters on the Lower West Plaza. Bike rack barricades separated the rioters from police moving further toward the Capitol building. From his position opposite the police line, Walters observed United States Capitol Police officers directing rioters to move back and deploying chemical sprays and crowd control munitions to hold rioters back. *See* Trial Ex. 305 (side-by-side comparison showing view at police line and view of Walters' actions).

Despite seeing obvious signs that he should not be on Capitol Grounds, at approximately 1:12 p.m., Walters moved toward black metal fencing which had set up on the Lower West Plaza for the Presidential Inauguration, and willfully kicked and stomped the fencing until he destroyed two six-foot segments. *See* Trial Exs. 301, 304, 305 and 306.



*Image 1: Screenshot of Trial Ex. 301 at 00:58 showing Walters (circled in red and wearing black riot-style helmet and black ballistic-style vest) damaging fence.*

Walters and other rioters were then able to climb over the remnants on the ground.

*Walters Advances Toward the Capitol*

Still on restricted Capitol grounds, Walters filmed rioters engaging in violence toward police, chemical sprays being deployed by rioters and police, and rioters climbing on the temporary scaffolding erected for the Inauguration. Walters described "pepper spray . . . going back and forth on both sides," "a fight over the steps," and "concussive grenades." Exhibit A. In a subsequent

selfie-style video, he looked into his camera and commented that he got pepper spray in his mouth and eyes. *See* Exhibit B.



*Image 2: Screenshot of Exhibit B at 00:03 as Walters explains that police tried "to push us down the stairs" and "gained some ground on us."*

Despite witnessing scenes of violence around him, Walters commented that "it was definitely the most fun" he had in 15 years. Exhibit C. He filmed from the top of the inaugural scaffolding and boasted about the rioters' actions, stating "cops are kind of surrounded" and "if we wanted to, we could . . . eat these people alive right now." Trial Ex. 311.



*Image 3: Screenshot of open-source video showing Walters (circled in yellow) filming from top of inaugural bleachers.*

After rioters breached the police line on the West Front, Walters made his way up to the Northwest Courtyard.

*Walters Entry into the Capitol*

At approximately 2:42 p.m., rioters breached the Senate Parliamentarian's door for a second time. Three minutes later, at approximately 2:45 p.m., Walters entered the Capitol through the Senate Parliamentarian Door. As shown below in Exhibit D, Walters held on to the shoulder of the person ahead of him in a "column" or "stack" formation as he entered.



*Image 4: Screenshot of Exhibit D at 08:17 as Walters, wearing a ballistic helmet, grabs onto other rioters in a stack formation to enter Capitol through the Senate Parliamentarian's door.*

When he entered the Capitol building, he went directly to the Senate Parliamentarian's Office. There he filmed himself opening a refrigerator in the office and rummaging through it as other rioters looked through desks and personal belongings. *See* Exhibit D at 2:56-3:53 (asking if other rioters wanted a Dr. Pepper and commenting "they got champagne and shit . . . these fucking cunts").

Walters then exited the Senate Parliamentarian's Office and walked further in the Capitol down a corridor. He and fellow rioters were confronted by a line of police. Walters told police, "there's a million people behind us" and suggested that police should do a tactical retreat. Exhibit E at 1:00-1:30. Rioters then pushed through the line to go further into the building.

Walters advanced to a hallway near the Senate Democratic Policy Committee, the Senate Foreign Relations Committee Room, and a bust of Constantine Brumidi. *See* Exhibit F.

At approximately 3:04 p.m., police swept rioters, including Walters, out of the Brumidi Corridor area of the Capitol. Only after he was directed to leave by police did Walters leave the building. When he exited the building, he continued to film, stating that "We had them

outnumbered for a little bit but then they corralled us in a little spot, but they let us go." Exhibit F at 8:33-8:8:47.

*Walters Remains on Capitol Grounds*

Even after he left the Capitol building, Walters remained on Capitol grounds.

At about 4:45 p.m. Walters was on the presidential inauguration stage risers, turning in circles and filming. There he yelled at a line of police officers and a police officer stopped him and grabbed his arm in an effort to prevent him from moving toward steps that had already been cleared by police. Even then, he stayed in the area and again appeared to talk or yell at officers forming a police line. At about 5:08 p.m., still in the same area, he picked up a flagpole and removed a red flag from it and then handed the pole to a police officer.

At about 5:11 p.m., Walters and other rioters were cleared from the area of the inauguration stage by police. As he was being forced down the stairs by police, Walters unfurled the red flag and held it out to the crowd below the risers.

At dusk, a dense mob of rioters, including Walters, were pushed off of Capitol grounds. As police directed rioters to leave and a line of police moved toward them, Walters periodically turned and engaged with police by shouting. *See* Exhibit G at 29:10 to 31:00.



*Image 5: Screenshot of Exhibit G at 29:17 showing Walters (circled in yellow) confronting police as they try to clear the Capitol grounds.*

*Walters' Interview with the FBI*

On January 12, 2021, FBI agents interviewed Walters outside of his residence. Walters told the agents that he traveled from his home in Sparta, Wisconsin, to Washington, D.C. and arrived on January 5, 2021. Walters admitted being at the Capitol on January 6, 2021; however, he falsely claimed that he was pushed inside the Capitol building by the crowd and was forced inside. Walters stated that he attempted to livestream on Facebook, but he had technical difficulties, and his videos were subsequently "taken down" by Facebook. He admitted to having video and images on his phone. Walters told agents he departed Washington, D.C. on January 7, 2021, and drove home to Wisconsin.

*The Charges and Plea Agreement*

On May 5, 2024, the United States charged Walters by a five-count Information with violating 18 U.S.C. §§ 1361, 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On June 14, 2024, pursuant to a plea agreement, Walters pled guilty to Count One of the Information, charging him with violating 18 U.S.C. § 1752(a)(1), and agreed to proceed to trial to Count Five of the Information, charging him with a felony violation of 18 U.S.C. § 1361. Under the terms of

the plea agreement, Walters agreed to pay $2,000 in restitution for his role in the January 6 riot, plus an additional amount to be determined by the Court for the damage Walters caused to the black metal fencing on the West Front of the Capitol. On September 17, 2024, the Court found Walters not guilty of the felony violation of 18 U.S.C. § 1361, but guilty of the lesser included misdemeanor offense following a bench trial.

### III.    Statutory Penalties

Walters now faces a sentencing for violating 18 U.S.C. §§ 1361 and 1752(a)(1). As noted by the U.S. Probation Office, the defendant faces up to one year of imprisonment and a fine of up to $100,000 for each count. The defendant must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

### IV.    The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR.

Count One
| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B2.3(a)) | +4 |
| Specific Offense Characteristics (U.S.S.G. §2B2.3(b)(1)(A)) | +2 |
| Adjusted Offense Level | 6 |

<u>Count Five</u>
Base Offense Level (U.S.S.G. §2B1.1)                                          6

<u>Grouping Adjustments</u>
U.S.S.G. §3D1.2        Count One and Count Five do not group
U.S.S.G. §3D1.4        Use highest offense level and add units as appropriate 6
U.S.S.G. §3D1.4(a)     Total 2 units                                        +2


Acceptance of Responsibility (U.S.S.G. §3E1.1)                               -2

                                   Total Offense Level:        8

*See* PSR at ¶¶ 7, 36-61.

As set forth in the plea agreement, the parties agree that Section 4C1.1 does not apply in this case because of the defendant's personal use of violence or credible threats of violence against people or property under a totality of the circumstances. Plea Agreement at ¶ 5.C.

The U.S. Probation Office calculated Walters's criminal history as a zero (e.g., Category I). PSR at ¶¶ 7, 63-65. Accordingly, the U.S. Probation Office calculated Walters's total adjusted offense level, after acceptance, at 8, and his corresponding Guidelines imprisonment range at 0-6 months. PSR at ¶¶ 7, 104. Walters's plea agreement contains an agreed-upon Guidelines' calculation that mirrors the U.S. Probation Office's calculation.

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

## V.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of six months incarceration, 36 months of probation, 60 hours of community service, and $3,170 restitution.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Walters's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Walters, the absence of violent or destructive acts is not a mitigating factor. Had Walters engaged in such conduct, he would have faced additional criminal charges.

Walters prepared for the potential for violence on January 6 by wearing a riot-style helmet and ballistic-style vest. He was one of the first rioters on Capitol Grounds, arriving at the West Front by approximately 1:00 p.m. And he was one of the last rioters to leave the Capitol Grounds, exiting only when police cleared the area at dusk more than four hours later. Walters destroyed government property when he kicked and stomped on fencing set up for the Presidential Inauguration, and he also showed a disregard for property when he rummaged through a refrigerator as other rioters ransacked the Senate Parliamentarian's Office. Throughout the afternoon, despite witnessing violence and being tear gassed and pepper sprayed by police, he

filmed himself commenting how police were outmanned by the number of rioters and said that January 6 was the most fun he had in 15 years. He joined and assisted the mob which confronted police on the West Front, advanced inside the Capitol building, and remained outside on the inauguration stage and West Terrace for hours. Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B.  Walters's History and Characteristics

As set forth in the PSR, Walters, a 38-year-old male, served in the United States Marine Corps from 2004 to 2007. PSR ¶ 89. While Walters' military service is laudable, it is also an aggravating factor. As a former Marine, Walters took an oath to support and defend the Constitution, an oath which he betrayed on January 6.

Moreover, although he does not have any criminal history points, the instant case is not his first charged offense.  In 2015, police responded to a report of a domestic disturbance between Walters and his then wife. Among other things, Ms. Walters alleged that the defendant "struck her with two fists and that he struck and pushed her multiple times." PSR ¶ 64. According to the PSR, the defendant "denied striking her but instead said he pushed her and told her to get out of the house." *Id.* The defendant pleaded guilty to disorderly conduct and agreed to a diversion agreement for a period of 12 months. *Id.* In addition, in 2003, Walters pleaded guilty to contributing to truancy (amended from contributing to the delinquency of a child) and possession of marijuana and was sentenced to forfeiture and a fine. PSR ¶ 63.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot.  *See United*

*States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a term of incarceration. Walters was on the Capitol Grounds for hours and challenged officers throughout the day. First, he kicked and stomped on fencing on the West

Front, which made it easier for the crowd to unlawfully advance while simultaneously making it more difficult for officers to try to stop the approaching crowd. He then joined rioters inside the Capitol building, where he rummaged through personal property and confronted police. Despite being swept from the building by police and directed to leave, Walters remained on the Capitol grounds for hours afterwards. He only left the grounds when police finally had enough reinforcements to fully clear the Capitol grounds at dusk. Because his actions that day showed an unwavering willingness to violate the law, his sentence must be sufficient to provide specific deterrence from committing future crimes.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers.[2] This Court must sentence Walters based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

---

[2] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

This case is most analogous to *United States v. Dylan Cronin*, 22-cr-233 (ABJ). In that case, the defendant was convicted following a guilty plea to the identical charges in this case—18 U.S.C. § 1361 and 18 U.S.C. § 1752(a)(1). Cronin approached the Capitol on the West Front and sprayed a fire extinguisher at police on the Upper West Plaza. He then assisted in the first breach of the Senate Wing Door by kicking at the window and using a piece of lumber to break the windowpane. After other rioters finished the job of breaking through the door and ultimately breaching the building, Cronin entered the building and stayed inside until he and other rioters were forced out. Judge Berman Jackson sentenced Cronin to eight months of incarceration.

Like Walters, Cronin's property damage early in the afternoon on January 6, 2021 enabled rioters to surge against police. They both also stayed inside the Capitol building until being forced out, although the government acknowledges that Cronin entered the Capitol building on three different occasions.

In another comparable case, *United States v. Winegeart*, 22-cr-301 (CJN), the defendant picked up a wooden pole with metal eye-bolts on the end and swung it twice against the House Exterior Door and its window at approximately 3:04 p.m. Winegart was subsequently found guilty of the misdemeanor version of 18 U.S.C. § 1361 and acquitted of other misdemeanor charges Although in contrast to Walters and Cronin, Winegeart refused to accept responsibility for her actions, destroyed evidence, and publicly threatened witnesses and those involved in the prosecution of rioters on the Internet, Walters' actions on January 6 itself were more troubling. Walters prepared for violence by wearing a riot-style helmet and ballistic-style vest, arrived much earlier in the day and stayed later, watched fellow rioters assault police, and filmed himself expressing jubilation about he and the other rioters overpowering police. Walters also entered the

Capitol building and went into a private office where he rummaged through a refrigerator, and confronted police at various places inside and outside the Capitol building.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## VI.    Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[3] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify

---

[3] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Walters must pay $2,000 in restitution, which reflects in part the role Walters played in the riot on January 6.[4] Plea Agreement at ¶ 12.  As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023." *Id.*

Walters also must pay an additional amount as determined by the Court in restitution to the Architect of the Capitol for the damage he did to metal fencing on the West Front of the Capitol. Plea Agreement at ¶ 12. The government estimates the amount of damage directly attributable to Walters to be $1,170. As stated in the plea agreement, Walters reserves the right to dispute that amount only.

## VII.    Fine

The defendant's convictions for violations of 18 U.S.C. § 1752(a)(1) (Count One) and 18 U.S.C. §§ 1361 and 2 (Count Five) subject him to a statutory maximum fine of $100,000 for Count One and $100,000 for Count Five. *See* 18 U.S.C. § 3571(b). In determining whether to impose a

---

[4] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines require a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a) (2023). Here, the defendant's financial assets set forth in the PSR suggest that the defendant is unable, and is unlikely to become able, to pay a fine.

## VIII.   Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to six months of incarceration, 24 months of supervised release, 60 hours of community service, and $3,170 restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Walters's liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

<div style="margin-left:40%">

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    */s/ Sarah W. Rocha*
      SARAH W. ROCHA
      Trial Attorney
      D.C. Bar No. 977497
      601 D Street, NW
      Washington, DC 20004
      sarah.wilsonrocha@usdoj.gov

</div>